Michael Gaspar and Mary Gaspar v. Commissioner.
Gaspar v. Commissioner
Docket No. 6998-65.
United States Tax Court
T.C. Memo 1968-131; 1968 Tax Ct. Memo LEXIS 159; 27 T.C.M. (CCH) 634; T.C.M. (RIA) 68131; June 27, 1968, Filed *159 Held: Respondent failed to prove fraud or that petitioner omitted from gross income an amount properly includable therein in excess of 25 percent of the amount of gross income stated in petitioners' return. Secs. 6501(c) and 6501(e) not applicable. Assessment and collection of tax is barred by statute of limitations. Howard R. Weil, 555 Cedar Lane, Teaneck, N.J., for the petitioners. Julius M. Jacobs, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1959 in the amount of $18,322.39 and an addition to tax under section 6653(b), I.R.C. 1954, [1] in the amount of $9,161.19. The issues are (1) whether respondent correctly computed petitioners' taxable income for 1959 under the bank deposits method; (2) whether any part of the underpayment of tax for 1959 was due to fraud within the meaning of section 6653(b); and (3) whether assessment and collection of tax for the year 1959 is barred by the statute of limitations. Findings of Fact Some of the facts were stipulated and they are so found. Michael Gaspar and Mary Gaspar, husband and wife, were residents of Arlington, N.J., at the time of the filing of their petition. *161 They filed a joint income tax return for 1959 with the district director of internal revenue, Newark, N.J., on April 15, 1960. Michael Gaspar will hereinafter be called petitioner. On December 1, 1958, petitioner and his wife purchased a tavern in Jersey City, N.J., together with the liquor license for the tavern and the real estate and improvements for $18,000. They paid $8,000 cash and gave a purchase money mortgage for the remaining $10,000. The building consisted of a ground floor, which was occupied by the tavern, and an upper floor occupied by petitioners and their son, Michael E. Gaspar, Jr., as their living quarters. During 1959 petitioner was employed by the Central Railroad of New Jersey as a car inspector and received wages in the total amount of $4,749.84. Petitioner had been employed by the Central Railroad of New Jersey since 1928. During 1959 petitioner's wife was employed on a part-time basis as a cleaning woman by Terminal Cleaning Contractors, Inc., and by 120 Broadway Management Corp., both in New York City, and received wages in the total amount of $812.04. During 1959 petitioner tended bar at his tavern in the morning from 6 a.m. until his son, Michael, relieved *162 him at about 7:40 a.m., when petitioner went to work in the railroad yards. Petitioner also tended bar in the afternoon and evening after returning from work for the railroad at 4 p.m. Petitioner also tended bar on the days he did not work for the railroad. Petitioner's wife and his son took care of the tavern business during petitioner's absence, with his wife preparing the food served at the tavern and his son tending bar. Petitioner's tavern was situated near the railroad yard where he worked. The terminals of the Lehigh Valley Railroad and the Railway Express Agency were located nearby, and there were also several small factories, stevedoring companies, and other business concerns in the immediate vicinity. 635 Prior to his purchase of the tavern in 1958, petitioner made an arrangement with the Commercial Trust Co. of New Jersey, in Jersey City, N.J., whereby he would be permitted to withdraw cash against deposited, but uncollected, checks. This arrangement, which was similar to the arrangement the bank had with the prior owner of the tavern, was made in order to enable the petitioner to cash the pay checks of many of the tavern customers who worked at the nearby railroad *163 yards, factories, and other business concerns. On November 5, 1958, prior to his purchase of the tavern, petitioner opened a regular checking account with the Commercial Trust Company of New Jersey. Withdrawals from this checking account were authorized to be made by either petitioner or his son. On February 9, 1959, a special account was opened with the bank in the name of petitioner's son, Michael. All withdrawals from this special account were made by Michael. Petitioner's arrangement with the bank concerning cash withdrawals by him against deposited, but uncollected, checks applied to both the regular checking account and the special account. The Central Railroad of New Jersey made salary payments to its employees on the 11th and 26th of each month, while the Lehigh Valley Railroad paid its employees on the 10th and 25th of each month. The stevedoring companies paid their employees every Wednesday, and some of the factories nearby paid their employees on Tuesday and Friday. On the four railroad paydays each month petitioner stayed at the tavern the entire day in order to handle the large checkcashing operation. Petitioner tried to anticipate the cash needed on those days by *164 making advance withdrawals from the bank. Some of the railroad employees brought in their checks and cashed them personally; others would send their checks to the tavern in the morning in groups ranging from 10 to 20 checks and would pick up the cash later in the day. At times, petitioner would deposit in the bank the checks which he had cashed for various customers and would withdraw cash against that deposit to meet the check-cashing needs later in the day. All checks received in the check-cashing operations were deposited in both the regular or special account and cash withdrawals were made from both accounts. Prior to December 1, 1958, when the tavern was purchased by petitioner, a total of $9,600 was deposited in the regular checking account. On November 13, 1958, a withdrawal of $2,375 was made from a savings account in the name of petitioner and his wife at the Provident Institution for Savings in Jersey City and on the same date a withdrawal of $1,225 was made from a savings account in the same bank in the name of Mary Gaspar, Trustee for Michael E. Gaspar, Jr. After these withdrawals, both savings accounts were left with minimal balances. Petitioner obtained additional funds *165 at about this time by cashing his U.S. bonds for about $2,000, by borrowing approximately $2,000 on his life insurance policies, and by borrowing from friends. Petitioner also obtained money from his wife. Petitioner's income tax return was prepared by Albert Obolsky, an accountant who had also done some accounting work for the prior owner of the tavern. In preparing petitioner's income tax return for 1959, Obolsky used a figure for total receipts from an adding machine tape which petitioner showed him at the end of the year. Obolsky added to the figures shown on the tape certain other cash amounts received by petitioner during the year for the use of the telephone, from the bowling alley, and from other small items. Obolsky used bills and invoices submitted to him by petitioner to compute the cost of merchandise purchased and other business expenses. Obolsky also prepared certain monthly alcoholic beverage reports on the basis of invoices he obtained from petitioner once a month. Obolsky never saw the checkbook used by petitioner and he never reconciled petitioner's bank statements. On February 8, 1960, petitioner's wife and his son were arrested at the tavern by local police *166 officers and were charged with violating section 2A:170-18 of the New Jersey Statutes Annotated, which states as follows: 2A:170-18. Possession of lottery or numbers slips. Any person who has in his possession or custody any lottery slips, books or records pertaining to a lottery, or any person who has in his possession or has in an automobile in his custody any ticket or tickets, slip or slips, paper, document or memoranda in any way pertaining to the business of a number game, is a disorderly person. "Number game" as used in this section means any betting on any number or numbers, or sets or arrangements of numbers, on or according to any plan or method whatsoever. Petitioner's wife, Mary, pleaded guilty to the charge and was fined $100; and the 636 charge against petitioner's son, Michael, was dismissed. As a result of a raid by agents of the U.S. Treasury Department on petitioner's tavern on July 28, 1960, the petitioner and his wife were charged with violating the Gaming Statutes of the State of New Jersey and maintaining a gambling establishment. They pleaded not guilty and, after a trial before a judge and jury in the Hudson County Court of New Jersey, the jury brought *167 in a verdict of not guilty. In a subsequent libel action tried before a jury in the U.S. District Court for the District of New Jersey on August 5, 1964, the jury found that certain items seized in the raid, including $10,641.53 in currency, were not subject to forfeiture and that petitioner had a valid claim to the property. In connection with the investigation of petitioner's income tax return for 1959 respondent obtained the bank statements for the petitioner's regular checking account at the Commercial Trust Co. of New Jersey covering the period from November 5, 1958, through January 29, 1960, as well as the bank statements for the special account at the same bank covering the period from February 9, 1959, through January 6, 1960. Respondent also obtained copies of the deposit slips for both accounts at the bank and examined the microfilm of the checks drawn to the accounts. Based upon his examination of the bank's records, the respondent prepared a schedule showing the payees of the checks drawn during 1959 on the regular checking account. All checks drawn on the special account during 1959 were made payable to cash. Using the above information, respondent computed petitioner's *168 business income for 1959 under the bank deposits method. Respondent treated the deposits made in the regular checking account and in the special account, with some exceptions, as business deposits. Withdrawals in cash and by check from both accounts, with some exceptions, were treated as business withdrawals which reduced business income. Respondent's computation of petitioner's business income for 1959 under the bank deposits method is as follows: Regular checking account
Deposits-check
$ 193,717.49
Deposits-cash 39,300.00
Total Deposits
$ 233,017.49
Withdrawals and charges
Checks to specific payees
42,587.04
Checks to cash
188,298.21
Debit memos
787.20
Bank service charges 95.21
Total withdrawals and charges
$ 231,767.66
Less: Personal and nondeductible items
Prudential Insurance Co
$ 948.85
Internal Revenue Ser
1,743.04
N.J. Div. Motor Vehicles
25.00
Contributions
2,660.00
Payments to GMAC, less interest
886.61
Veterans Administration
31.90
Total payments on mortgage, less interest 2,316.20
Total personal and nondeductible withdrawals 8,611.60
Balance of withdrawals applicable to business expenses and costs 223,156.06
Net business income - regular account
$ 9,81.43
Special account
Deposits - checks
$1,000,198.85
Deposits - cash 382,230.00
Total deposits
$1,382,428.85
Exclusion from business deposits of net cash from wages of petitioner, Mary Gaspar, and Michael E. Gaspar, Jr. 6,676.31
Total business deposits
$1,375,752.54
Withdrawals and charges
Checks (all drawn to cash)
$1,333,500.00
Debit memos
4,152.54
Bank service charges 128.09
Total withdrawals and charges $1,337,780.63
Net business income - special account
37,971.91
Net business income - regular account (above) 9,861.43
Total net business income per bank deposits method
$ 47,833.34
*169 637 Respondent then computed the taxable income for 1959 of petitioner and his wife as follows: Net business income per bank deposits method
$47,833.34
Add: Inventory on hand for which deduction has already been allowed by withdrawals from banks
$1,551.00
Less: Business depreciation allowable and not taken into account under bank deposits method 485.73
Net increase in sch. C income
$ 1,065.27
Wages - petitioner
4,749.84
Wages - Mary Gaspar 812.04
Adjusted gross income
$54,460.49
Itemized personal deductions
Contributions
$2,660.00
Automobile license plates
25.00
Gas and cigarette tax
76.25
Union dues
68.00
Interest paid to Credit Union 22.67
Total itemized personal deductions $ 2,851.92
Net income
$51,608.57
Exemptions 1,200.00
Taxable income
$50,408.57
In the joint income tax return for the year 1959 filed by petitioner and his wife they reported a net profit from the operation of the tavern in the amount of $10,339.51 and combined wages in the amount of $5,561.88, or a total adjusted gross income of $15,901.39. Respondent in his statutory notice of deficiency determined that petitioner and his wife *170 had unreported business income in the amount of $39,480.25 in 1959, based upon respondent's computation that their correct business income for 1959 was $49,819.76 [2] rather than the amount of $10,339.51 reported by them. The statutory notice of deficiency for the year 1959 was mailed on September 15, 1965. Ultimate Findings of Fact Respondent failed to prove that the joint income tax return filed by petitioner and his wife for the taxable year 1959 was false or fraudulent with intent to evade tax. Respondent failed to prove that petitioner and his wife omitted from gross income on their joint income tax return for 1959 an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return for that year. Opinion Since the statutory notice of deficiency for the year 1959 was not mailed to petitioner and his wife until September 15, 1965, more than 3 years from the due date of their income tax return for *171 1959, it is apparent that assessment and collection of tax for the taxable year 1959 is barred by the statute of limitations, section 6501(a), unless the exception prescribed in either 638 section 6501(c) or section 6501(e) is applicable to the facts of this case. Section 6501(c)(1) provides that "In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." Section 6501(e)(1) provides that "If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed." The burden of proof with respect to fraud is upon the respondent and he must establish fraud by clear and convincing evidence. Jack M. Chesbro, 21 T.C. 123 (1953), affd. per curiam 225 F. 2d 674 (C.A. 2, 1955); Arlette Coat Co., 14 T.C. 751 (1950). We have held that a mere understatement of *172 income does not establish fraud. L. Glenn Switzer, 20 T.C. 759; James Nicholson, 32 B.T.A. 977 (1935), affd. 90 F. 2d 978 (C.A. 8, 1937). The existence of fraud with intent to evade tax must be affirmatively established. Drieborg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955). We are here concerned with the operation of a tavern in its first year of operation. Petitioner had been for more than 30 years an employee of the Central Railroad of New Jersey and continued in such employment after he purchased the tavern on December 1, 1958, for $18,000. The tavern was a family operation, with petitioner tending bar before and after his normal working hours for the railroad and on his days off. Petitioner's working day began at 6 a.m. and did not end until very late in the evening when he closed the tavern. Petitioner's son worked at the tavern, and petitioner's wife prepared sandwiches for customers and did general cleaning work. The record does not show that petitioner had any prior experience in the operation of a business or any training in proper record-keeping. Petitioner testified that he followed the advice of his accountant *173 and recorded in a book his daily cash receipts as indicated by the cash register tape. He testified he made these entries in the cash receipts books "practically every day." However, petitioner explained that he did not have the record book, which he described with some explicitness, at the time of the trial because it had been seized, along with many other items, in the raid on the tavern conducted by agents of the U.S. Treasury Department on July 28, 1960, and never returned to him. The evidence on the disappearance of the record book is unclear. Special Agent Ronald P. Graziano was not assigned to petitioner's case until early in 1964 when, according to his testimony, a box of records seized in the raid between 3 and 4 years earlier was made available to him. He testified that, in addition to checkbooks, there was a blank ledger book, a second ledger book with entries on the first two pages, and two spiral notebooks for receipts, one for 1959 and one for 1960. The special agent testified that the book for 1959 was incomplete in that it did not cover a full year. [3] He also testified that in November 1964 he returned to petitioner "everything that was turned over to me that I had *174 received in that box, which would include the records that I have just described." In other words, the special agent merely accepted a box of records which he was told were seized in a raid more than 3 years earlier. With the record in this ambiguous state, we cannot say with certainty that the cash receipts book which petitioner testified that he kept in 1959 prior to the raid did not actually exist. Moreover, we gather from the special agent's testimony that some record of receipts in 1959 did exist although it did not cover a full year. It is evident that petitioner's bookkeeping practices were informal and far from adequate. Albert Obolsky, who advised petitioner as to the necessary records to be kept, was in 1959 employed in the New York City Post Office and only worked part time as an accountant. He prepared various alcoholic beverage returns from invoices he obtained in an envelope from petitioner once a month. He prepared petitioner's income tax return on the basis of information supplied to him by petitioner. *175 Obolsky testified that "I didn't know anything about his [petitioner's] business outside of what he gave me." There was no attempt by petitioner or his accountant to reconcile any of the bank 639 statements for the regular checking account and the special account during 1959. It appears that the extensive check-cashing operations by petitioner in 1959 involved both bank accounts and were indiscriminately intermingled with the tavern's receipts and expenditures. Some indication of the extent of the check-cashing operations may be gained from respondent's Exhibit J which shows total deposits of checks in the special account alone in the amount of $1,000,198.85 and withdrawals (by checks drawn to cash) also in excess of $1 million. At most, this record reveals ample proof of inadequate record-keeping by petitioner, and perhaps a penchant for unbusinesslike methods in his operation of the tavern, but it is clear that evidence of inefficiency and ignorance of accounting methods are not sufficient to establish fraud. Walter M. Ferguson, Jr., 14 T.C. 846 (1950); W. F. Shawver Co., 20 B.T.A. 723 (1930). Respondent has not shown any positive or affirmative *176 act by petitioner indicating clearly and convincingly that fraud was present. It should be emphasized that the understatement of petitioner's income, covering the single taxable year 1959, was computed by respondent under a method which is based upon the principle that unexplained bank deposits are evidence of taxable income. Lessmann v. Commissioner, 327 F. 2d 990 (C.A. 8, 1964), affirming a Memorandum Opinion of this Court. However, it is undisputed that petitioner engaged in a large check-cashing operation and that a large part of the deposits in both bank accounts was from the check-cashing operation, and there is no evidence that petitioner made a profit on that operation. In fact, under these circumstances it would seem that the bank deposits method of computing income would be inapt and unreliable. Petitioner has offered a reasonable explanation for the deposits. Respondent computed petitioner's business income as the difference between the deposits and the withdrawals in the bank accounts. This is more akin to relying on an increase in one item in a net worth statement. We have examined the entire record and are not persuaded that the evidence is sufficient to *177 establish fraud. It might strongly suggest a suspicion of fraud, but "Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud." L. Glenn Switzer, supra, at 765. Accordingly, we find that respondent has failed to carry his burden of proving by clear and convincing evidence that petitioner's income tax return for the taxable year 1959 was false or fraudulent with intent to evade tax within the meaning of section 6501(c). Respondent also contends that the 6-year period of limitations provided for in section 6501(e) is applicable. Under this section, respondent has the burden of proving that the petitioner omitted from gross income an amount properly includable therein in excess of 25 percent of the amount of gross income stated in the return. C.A. Reis, 1 T.C. 9 (1942). To show that section 6501(e) applies here, respondent contends that the correct gross income figure is $1,608,770.04 instead of the amount of $51,777.77 actually reported by petitioner in his income tax return for 1959 and that, as these figures show, the omission from gross income is clearly in excess of 25 percent of the amount of gross *178 income stated in the return. Respondent obtains the figure of $1,608,770.04 by totaling all check deposits and all cash deposits in both the regular and the special bank accounts throughout the year, or $1,615,446.35, and subtracting $6,676.31 which represents the total net wages earned by the Gaspars during 1959 and deemed by respondent as deposited by them in the bank accounts. Respondent relies on the $1,608,770.04 figure thus obtained as the gross receipts or gross income of petitioner's tavern business to carry his burden of proving that section 6501(e) is applicable. We believe that respondent has, under the facts of this case, misinterpreted the term "gross income." Section 6501(e)(1) (A)(i) provides that "In the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services." The record shows that petitioner regularly cashed the pay checks of his customers who worked in nearby railroad yards, factories, and other business establishments and that such check-cashing operations were extensive *179 in nature. In fact, petitioner made special arrangements with his bank permitting him to withdraw cash against deposited but uncollected checks to facilitate the check-cashing operation. It is evident that a substantial portion of the figure $1,608,770.04, which respondent puts forth as the correct amount of petitioner's gross income in 1959, represents nothing more than the myriad of payroll checks cashed by petitioner and 640 deposited in the bank for collection plus redeposits of cash withdrawn in excess of the amounts actually needed to cash the checks. We can perceive no justification for treating these checks, which merely cleared through petitioner's bank accounts, and cash redeposits, as "amounts received or accrued from the sale of goods or services" within the meaning of the statute. Moreover, the statutory definition in section 6501(e)(1) (A)(i) clearly limits gross income to those amounts which are "required to be shown on the return." Here, petitioner merely served as a conduit for these payroll checks cashed by him throughout the year. Certainly they do not represent amounts received by him from the sale of any goods or services, and we do not believe that he was *180 required to show the amounts of such cashed checks on his return. To prevail here, respondent must show that petitioner omitted from his return an amount of gross income properly includable therein and that such omitted gross income exceeded 25 percent of the gross income actually reported by him. It is apparent that respondent has failed to meet his burden. We cannot accept the figure of $1,608,770.04 as the correct gross income and, on this record, it would be an impossible task to determine with any semblance of accuracy what portion of this figure represents gross income from the sale of goods or services. We conclude that respondent has not met his burden of proving that the 6-year statute of limitations provided in section 6501 (e)(1) is applicable. Consequently, we hold that assessment and collection of any deficiency for 1959 is barred by the statute of limitations. Decision will be entered for the petitioner. Footnotes
1. All section references will be to the 1954 Internal Revenue Code↩, as amended, unless otherwise noted.
2. The discrepancy between this figure which was shown to be the net profit from the business in the notice of deficiency and the $47,833.34 shown as the net business income in the computation above is not explained.↩
3. It should be noted that the special agent's description of the spiral notebook did not coincide with petitioner's description of the cash receipts book kept by him.↩